

FILED

MAR - 2 2009

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**
Norfolk Division

LAKE WRIGHT HOSPITALITY, LLC,

        Plaintiff,

v.                                   ACTION NO. 2:07cv530

HOLIDAY HOSPITALITY FRANCHISING, INC.,
INTERCONTINENTAL HOTELS GROUP PLC, and
SIX CONTINENTS HOTELS, INC.,

        Defendants.

## REPORT AND RECOMMENDATION

This matter was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and (C) and Rule 72(b) of the Federal Rules of Civil Procedure, as well as Rule 72 of the Rules of the United States District Court for the Eastern District of Virginia, by order of reference entered October 20, 2008.

This case was referred for a Report and Recommendation on Defendants' Motion for Summary Judgment [Doc. 80] and all other pending motions relevant to the disposition of the matter. In addition to the Motion for Summary Judgment, the relevant pending motions are: (A) Defendants' Motion to Strike Expert Reports and Testimony Regarding Impact Damages [Doc. 55]; (B) Defendants' Motion to Strike Plaintiff's Damage Experts [Doc. 93]; (C) Plaintiff's Motion to Strike Summary Judgment Reply or, in the alternative, for Permission to File Surreply [Doc. 125];

(D) Defendants' Motion to Preclude Plaintiff from Using Depositions Taken in Violation of Court Order [Doc. 134]; and (E) Lake Wright's Supplemental Memorandum Filed Under Court Order of November 7, 2008 [Doc. 135].[1]

## I. STATEMENT OF FACTS

As a preliminary matter, Plaintiff has complicated the Court's identification of undisputed facts by drafting the Opposition Brief [Doc. 103] with utter disregard for local rules, professional responsibility, and the integrity of the Court. As detailed in Appendix A of this Report and Recommendation,[2] Plaintiff crafted its statement of facts with the following impermissible tactics: (A) argument (see Appendix A, at ¶¶ 11, 19, 21, 33, 37, 42, 67, 75-76, 79, 87, 90); (B) unsupported facts (see Appendix A, at ¶¶ 7, 10-12, 16, 19, 20-21, 27, 33, 37, 39, 42, 58, 67, 75-76, 79, 82, 87-88, 90, 93-94, 102); (C) misleading statements (see Appendix A, at ¶¶ 9-10, 12, 19, 22, 26-27, 56-57, 68, 82, 90, 95, 102); and most disturbing, (D) misrepresentations (see Appendix A, at ¶¶ 20, 35, 46, 80). In addition to the corrupted body of the brief, which already exhausts the page limit, Plaintiff also attaches an exhibit entitled, "Disputed Facts Summary" (Pl.'s Ex. 1),[3] which does more than "summarize" the disputed facts. Exhibit 1 introduces new sources for disputing Defendants'

---

[1] Lake Wright's Supplemental Memorandum Filed Under Court Order of November 7, 2008 is not a motion, but rather, a submission of "additional facts with which to dispute Defendants' Motion for Summary Judgment." [Doc. 135, at 1.] Defendant opposed consideration of this Supplemental Memorandum by filing a brief [Doc. 142], after which Lake Wright filed a rebuttal brief [Doc. 145]. The Court will address whether consideration of Lake Wright's Supplemental Memorandum would be proper for ruling on the Motion for Summary Judgment.

[2] Appendix A examines Plaintiff's "Counterstatement of Undisputed Facts and Disputed Items in Defendants' Statement of Fact" and provides a list, which is not exhaustive, of Plaintiff's misconduct in drafting these facts.

[3] All citations to Plaintiff's exhibits refer to the exhibits attached to Plaintiff's Opposition to Motion for Summary Judgment [Doc. 103].

statement of facts, thereby circumventing the page limit for the brief.[4] Even if the Court considered

Exhibit 1, however, the majority of references fail to dispute the identified portions of Defendants'

facts.[5]  In sum, Plaintiff has not effectively disputed Defendants' List of Undisputed Facts, as

claimed.  Under Local Civil Rule 56(B), the Court adopts each of Defendants' facts that Plaintiff has

not effectively disputed.  Furthermore, the Court refuses to adopt each of Plaintiff's "undisputed"

facts that were either argument, unsupported, misleading, or misrepresented.

## UNDISPUTED FACTS

This matter arises from a dispute between a hotel franchisor and franchisee.  On September

25, 1997, LTD Management Company, LLC ("LTD") entered into a License Agreement with

Defendant Holiday Hospitality Franchising, Inc. ("Holiday") to develop and operate a Holiday Inn

Hotel & Suites in Norfolk, Virginia.  On July 19, 1999, an addendum amended the License

Agreement to reflect LTD's assignment of its rights under the agreement to Plaintiff Lake Wright

Hospitality, LLC ("Lake Wright").  In July 2000, Defendant's property inspector, Robert Bush,

visited Lake Wright's hotel during the final stages of construction, realized that the construction

exceeded the brand standards, and briefly suggested that Lake Wright consider branding the hotel

as a Holiday Inn Select ("HISL").  (Pl.'s Ex. 18 at 17-18.)   Lake Wright then telephoned one of

---

[4] The page limit for the brief was 40 pages, as ordered by the Court on October 28, 2008 [Doc. 101].

[5] In several instances, Exhibit 1 attempts to dispute *one* paragraph of Defendants' facts by flinging numerous pages of Plaintiff's brief against the wall to see if anything will stick.  For example, Exhibit 1 disputes Paragraph 28 of Defendants' facts with the following citation: "*See* Facts ¶¶ 10-50." Not surprisingly, not one of the forty-one cited paragraphs disputes the fact that Defendants commissioned a study of its brands (Def.'s Br. at ¶ 28).  But even if a relevant fact were hidden within Plaintiff's vast citations, the Court would be "well within its discretion in refusing to ferret out the facts that counsel had not bothered to excavate." Cray Comm., Inc. v. Novatel Computer Sys., Inc., 33 F.3d 390, 396 (4th Cir. 1994).

Defendant's franchise sales representatives, Mike Horgan, to discuss a conversion to the HISL brand. (Pl.'s Ex. 48 at 127-129.) After that conversation, Lake Wright and Holiday entered into a Fourth Addendum to the License Agreement, dated October 23, 2000, whereby Lake Wright agreed to open the hotel as a HISL, rather than a Holiday Inn Hotel & Suites. (Pl.'s Ex. 51.) On November 27, 2000, the hotel opened as a HISL, and a year later, won the "Newcomer of the Year" award. (Pl.'s Ex. 30 at 67-68.) ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████. (Def.'s Ex. 1 at 24-31, and Ex. 3 at 142.)[6]

Plaintiff alleges that Defendants "killed" the HISL brand extension before Lake Wright contracted to open as a HISL, but due to the misleading statements, misrepresentations, and unsupported facts underlying these allegations (see Appendix A), the undisputed facts of the case depict a different history for HISL. Defendants created the HISL brand extension in 1994 as part of Holiday Inn's overall brand architecture. (Merkin Decl. [Doc. 82] at ¶¶ 13, 21.) In 1998, Defendants launched a major print advertising campaign in business publications to promote HISL. (Pl.'s Ex. 8 at 190-191.) In the summer and fall of 2000, Defendants executed a marketing plan for HISL, which included a partnership promotion with Etrade. (Merkin Decl. at ¶ 24.) By October 2000, there were more than 70 hotels operating under the HISL trademark. (Id. at ¶ 19.) In 2003, Defendants launched a print advertising campaign in the Wall Street Journal, which highlighted the

---

[6] Citations to Defendants' Exhibits 1, 3, and 4 refer to the exhibits attached to Defendants' Brief in Support to Motion for Summary Judgment [Doc. 116]. Citations to the remainder of Defendants' exhibits, however, refer to Defendants' court-ordered supplemental filing [Doc. 154]. Furthermore, the Court has sealed the unredacted version of this Report and Recommendation, mailed the unredacted version to the parties, and provided the unredacted version to the District Judge.

HISL message and HISL locations. (Merkin Decl., Ex. P at D-0018915.) At the owner's conference in June 2004, Defendants presented a new strategy for HISL to address the market conditions and the challenges facing the HISL brand extension. (Merkin Decl. at ¶ 28.) Around that time, Defendants commissioned a study of its brands, which concluded that there was little room in the market for differentiation between HISL and the core Holiday Inn brand. (Id. at ¶ 31.) After HISL owners failed to express commitment to the new initiatives to differentiate the HISL brand extension (Id. at ¶ 32), Defendants announced a decision to cease "specific marketing initiatives" for HISL and to stop selling new HISL franchises. (Pl.'s Ex. 35.) This announcement memorandum, dated March 24, 2006, stated that: (A) HISL franchisees may elect to retain the HISL designation for the remainder of their licenses; (B) website and call center support for HISL continues; and (C) if a franchisee does not wish to remain a HISL, Defendants will pay the cost of changing the signage. Id. Plaintiff elected to remain a HISL, and currently operates the hotel as a HISL. (Merkin Decl. at ¶ 33.) The hotel continues to receive between 40% and 60% of its reservations through the Holiday Inn reservations system (Def.'s Ex. 3 at 92-93), and Defendants continue to maintain the website, "hiselect.com" (Merkin Decl. at ¶ 36).

In May 2007, Defendants received two applications to develop a Holiday Inn Express in the vicinity of Plaintiff's hotel. (Id. at ¶ 38.) Mike Horgan, Defendants' franchise sale representative, advised Plaintiff of these two applications and suggested that Plaintiff consider submitting its own application for a Holiday Inn Express. (Def.'s Ex. 3 at 87-88.) Plaintiff declined. (Id. at 87-89.) Defendants then sent formal notification letters to Plaintiff of the pending applications for the Holiday Inn Express. (Merkin Decl. at ¶ 39.) Plaintiff objected to the proposed Holiday Inn Express and requested that Defendants conduct an impact analysis. (Id. at ¶ 48.) Defendants conducted an

5

impact analysis, relying on business mix and projections provided by Plaintiff, and completed the impact analysis on July 20, 2007. (Id. at ¶¶ 49-50.) On the same date, Defendants sent a copy of the impact analysis to Plaintiff with a cover letter stating that Plaintiff had until August 1, 2007 to submit comments on the analysis. (Id. at ¶ 50.) On August 3, 2007, Plaintiff submitted comments, which sought to change the business mix and projections Plaintiff had previously provided. (Id. at ¶ 51.) Although submitted late, Plaintiff's comments were provided to, and considered by, Defendants' Franchise Approval Committee ("FAC"). (Id. at ¶ 51.) On August 6, 2007, the FAC approved the new Holiday Inn Express[7] and notified Plaintiff of the decision. (Id. at ¶ 52.) Although under no obligation to do so, Defendants offered to do the following: (a) give Plaintiff a credit on its franchise fees during the first two years of the new Holiday Inn Express's operation; (b) conduct an impact tracking study once the new hotel opens; and (c) consult with Plaintiff regarding potential rate opportunities. (Id. at ¶ 53.) Plaintiff declined these offers (Id. at ¶ 53) and filed a lawsuit.

## II. PROCEDURAL HISTORY

On November 20, 2007, LTD and Lake Wright filed a Complaint in this Court against Holiday and InterContinental Hotels Group, PLC ("Intercontinental"). On December 20, 2007, the Plaintiffs filed an Amended Complaint, which added Six Continents Hotels, Inc. ("Six Continents") as a Defendant and alleged the following four counts against all Defendants: (I) Actual/Constructive Fraud and Fraud in the Inducement; (II) Breach of the Implied Covenant of Good Faith and Fair Dealing; (III) Violation of the Virginia Retail Franchising Act; and (IV) Breach of Contract. After motions to dismiss were filed by each of the Defendants, the Court dismissed all of LTD's claims against each Defendant, leaving Lake Wright as the sole Plaintiff. [Doc. 28.] Pursuant to a later court

---

[7] This Holiday Inn Express is scheduled to open in May 2009. (Merkin Decl. at ¶ 54.)

6

order [Doc. 53], Lake Wright supplemented its response to Defendants' First Set of Interrogatories on September 8, 2008. In particular, the supplemented response defined Counts I and IV in greater detail.

On October 16, 2008, Defendants filed a Motion for Summary Judgment. On November 7, 2008, the Court heard oral argument on this motion and several other pending motions. Randall K. Miller, Esq., and Nicholas M. DePalma, Esq., represented the Plaintiff. Robert M. Tata, Esq., and Wendy C. McGraw, Esq., represented the Defendants. The Official Court Reporter was Jody Stewart. On November 10, 2008, the Court issued an Order ruling on the majority of the motions, but reserved rulings for this Report and Recommendation on the following: (1) Defendants' Motion for Summary Judgment; (2) Defendants' Motion to Strike Expert Reports and Testimony Regarding Impact Damages [Doc. 55]; and (3) Defendants' Motion to Strike Plaintiff's Damage Experts [Doc. 93].

Since oral argument, the parties have filed additional documents relevant to disposition of this matter. The following matters are fully briefed and ripe for adjudication: (4) Plaintiff's Motion to Strike Summary Judgment Reply or, in the alternative, for Permission to File Surreply [Doc. 125]; (5) Defendants' Motion to Preclude Plaintiff from Using Depositions Taken in Violation of Court Order [Doc. 134]; and (6) Lake Wright's Supplemental Memorandum Filed Under Court Order of November 7, 2008 [Doc. 135].

The Court will first address the matters concerning discovery, then address the Motion for Summary Judgment.

7

## III. DISCOVERY MATTERS

### A. Expert Reports and Testimony

The Court RESERVES RULING on both Defendants' Motion to Strike Expert Reports and Testimony Regarding Impact Damages [Doc. 55] and Defendants' Motion to Strike Plaintiff's Damage Experts [Doc. 93]. The Court is recommending that summary judgment be granted in favor of Defendant on all claims. Thus, if this recommendation is adopted by the District Judge, there will be no reason to address these motions. If it is not adopted, then both motions are reserved until the decision on the Motion for Summary Judgment is finalized by the District Judge.

### B. Reply Brief and Requested Surreply Brief

On November 21, 2008, the Court issued an order ruling on briefing and discovery issues. In that order, the Court reserved ruling on Plaintiff's Motion to Strike Summary Judgment Reply or, in the alternative, for Permission to File Surreply [Doc. 125]. Section IV of this Report and Recommendation fully addresses the Motion for Summary Judgment. In drafting the Report, the Court did not rely on any new evidence presented by Defendants' Reply Brief in Support of Summary Judgment [Doc. 105]. Moreover, the legal argument in Defendants' Reply Brief directly responds to the legal argument contained in Plaintiff's Opposition Brief. Thus, the Court DENIES Plaintiff's Motion to Strike [Defendants'] Summary Judgment Reply and DENIES the alternative Motion for Permission to File Surreply.

### C. Deposition Testimony

The Court GRANTS, in part, Defendants' Motion to Preclude Plaintiff from Using Depositions Taken in Violation of Court Order [Doc. 134]. To the extent that Plaintiff attempted to convert the Rule 30(b)(6) depositions into "individual capacity" depositions, Plaintiff violated the

8

Court's order of November 7, 2008.  Upon review of the depositions, the Court finds that Mark Wells and Richard Kowaleski were questioned in their individual capacities. Further, the individual capacity testimony and Rule 30(b)(6) testimony were sufficiently commingled, so that the entirety of both depositions violates court order and is subject to sanction. Thus, the Court ORDERS that Plaintiff may not use the Wells deposition or the Kowaleski deposition for any purpose. With respect to the deposition of Robert Chitty, the Court does not impose sanction, but at the same time, does not find Chitty's testimony relevant to any material issue for summary judgment.

Accordingly, the Wells and Kowaleski depositions may not be part of Plaintiff's Supplemental Memorandum [Doc. 135].   Moreover, the remainder of the Supplemental Memorandum–the portions *not* taken from the recent depositions–is material that should have been included in the original memorandum in opposition to summary judgment. As a result, this material is untimely and will not be considered by the Court.

## IV. SUMMARY JUDGMENT

### A. Standard for Summary Judgment

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if "there is no genuine issue as to any material fact and the . . . moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). For the evidence to present a "genuine" issue of material fact, it must be "such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In deciding a motion for summary judgment, the Court must view the facts, and inferences to be drawn from the facts, in the light most favorable to the non-moving party. Id. at 255.  Either party may submit as evidence "pleadings, depositions, answers to interrogatories, and admissions on file, together with . . .

9

affidavits" to support or rebut a summary judgment motion. Fed. R. Civ. P. 56(c).

Rule 56 mandates a grant of summary judgment against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Accordingly, "Celotex made clear that Rule 56 does not require the moving party to negate the elements of the non-moving party's case." Cray Comm., Inc. v. Novatel Computer Sys., Inc., 33 F.3d 390, 394 (4th Cir. 1994)(quoting Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 885 (1990)). Rather, a plaintiff still bears the burden to produce evidence to support its claims, and the "the judge must view the evidence presented through the prism of the substantive evidentiary burden." Liberty Lobby, 477 U.S. at 252-56. For example, the burden of proof for a fraud claim is "clear and convincing evidence." Patrick v. Summers, 369 S.E.2d 162, 164 (Va. 1988). As a result, the Court can grant summary judgment on a fraud claim if it determines that no reasonable jury could find fraud by clear and convincing evidence. Liberty Lobby, 477 U.S. at 252-56.

Procedurally, the moving party "bears the initial responsibility" of demonstrating "the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. Local Civil Rule 56(B) of the Local Rules of the United States District Court for the Eastern District of Virginia (hereinafter "Local Civil Rule 56(B)") requires that the moving party's brief include a section listing all material facts as to which there is no genuine issue. Under this local rule, the moving party's list of facts is deemed admitted unless properly disputed by the non-moving party:

> A brief in response to such a motion shall include a specifically captioned section listing all material facts as to which it is contended that there exists a genuine issue necessary to be litigated and citing parts of the record relied on to support the facts alleged to be in dispute. In determining a motion for summary judgment, the Court may assume that facts identified by the moving party in its listing of material facts are admitted, unless such a fact is controverted in the statement of genuine issues

10

filed in opposition to the motion.

Loc. R. Civ. P. 56(B). As discussed earlier in this Report, Plaintiff's statement of facts consists of improper argument, unsupported facts, misleading statements, and misrepresentations. Thus, Plaintiff's statement of facts fails to controvert Defendants' statement of facts, and under Local Civil Rule 56(B), the Court assumes that Defendants' facts are admitted. JDS Uniphase Corp. v. Jennings, 473 F. Supp. 2d 705, 707 (E.D. Va. 2007); DePaoli v. Vacation Sales Assocs., LLC, 425 F. Supp. 2d 709, 711-12 n.1 (E.D. Va. 2005); Scott v. Wells Fargo Home Mortgage Inc., 326 F. Supp. 2d 709, 714 (E.D. Va. 2003). Furthermore, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 127 S.Ct. 1769, 1776 (2007). With these controlling principles in mind, the Court turns to the merits of the Defendants' Motion for Summary Judgment.

## B. Fraud (Count I)

The tort of actual fraud requires "(1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled." Flip Mortg. Corp. v. McElhone, 841 F.2d 531, 538 (4th Cir. 1999)(quoting Winn v. Aleda Constr. Co., 315 S.E.2d 193, 195 (Va. 1984)).[8] Pursuant to court

---

[8] Contrary to Defendants' argument, the law of the case doctrine continues to apply. In his Order dated March 11, 2008 [Doc. 28], District Judge Doumar held that "Georgia law governs the Plaintiff's contract claims whereas Virginia law governs the Plaintiff's tort claims." (March 11, 2008 Order, at 19.) Under Virginia law, the License Agreement's merger clause does not prevent Plaintiff from suing for fraud. Id. (citing Hitachi Credit Am. Corp. v. Signet Bank, 166 F.3d 614, 628, 630-31 (4th Cir. 1999) and FS Photo Inc. v. PictureVision Inc., 61 F. Supp. 2d 473, 481 (E.D. Va. 1999)).

order,[9] Plaintiff identified the fraudulent statements as:

> Robert Bush to Dilip Desai, during inspection of Plaintiff's property:
> A.    Lake Wright "should consider converting" to the HISL brand.
> B.    HISL was a separate brand offered by Defendants.
> C.    Defendants were supporting HISL, including with an existing advertising program.
> D.    HISL was a brand that was a cut above the ordinary Holiday Inn hotel and particularly suited to business travelers.
> E.    That choosing the HISL brand would allow Lake Wright to charge a higher room rate.
>
> Michael Horgan to Hari Thakkar, during their phone conversation:
> F.    The costs to convert the HISL specifications were reasonable and would be more than recovered by the additional profitability including through increased room rate that the HISL designation would allow.
> G.    Defendants were "committed" to supporting the HISL brand.
> H.    Defendants had a significant advertising program to support the HISL brand.
> I.    Defendants had established and were continuing to establish HISL as a distinctive brand that connoted (a) a higher quality hotel; and (b) particularly suited to business travelers.

Plaintiff's First Amended Response to Defendants' First Set of Interrogatories (Def.'s Ex. 6, at 1-2).

The interrogatory answer next alleges that the fraud case "also is grounded upon a concealment

theory," describing the concealment as a failure to disclose "that Defendants did not have an existing

program and existing commitment to support the Holiday Inn Select sub-brand." Id. at 2.  The Court

will discuss the alleged fraudulent statements in turn.[10]

### 1. Whether HISL was a separate brand

Robert Bush's alleged statement, that HISL was a separate brand, cannot constitute fraud.

---

[9] On August 27, 2008, the Court ordered Plaintiff to respond a second time to Defendant's First Set of Interrogatories and list with specificity each alleged fraudulent statement. [Doc. 53.] The Plaintiff is bound by the scope of its response. Id. at 7-11.

[10] The Court will not address Statement A by Mr. Bush, because it is clearly not a statement of *fact*, but rather, an invitation to consider taking an action.  Plaintiff's brief is silent on this statement.

First, the statement is not a false representation. At the time Bush made the statement, there were approximately 70 hotels operating under the HISL brand-extension, flying the HISL sign, and using the HISL logo. Second, the semantical distinction between "brand" and "brand extension" does not implicate a material fact, especially when the statement is attributed to a property inspector–rather than a sales or marketing person.[11] Indeed, Plaintiff does not argue that Bush's failure to add the word "extension" is fraud. Rather, the gravamen of Plaintiff's argument frames the fraud as hiding the alleged fact that Defendants were not *committed to supporting* the brand (extension).

### 2. Whether Defendants were committed to supporting HISL

The statements by Mr. Bush and Mr. Horgan, indicating that Defendants were committed to supporting HISL, do not create a triable issue of fraud. Most importantly, there is no evidence of a false representation. Plaintiff argues that Defendants' "commitment [to HISL] was extinguished in 1999, the year before Lake Wright purchased its franchise." (Pl.'s Br. at 31-32.) After accounting for Plaintiff's unsupported facts, misleading statements, and misrepresentations, however, the Court discredits the alleged "plot" to "kill" HISL. See Appendix A, at ¶¶ 10-12, 16, 19-22, 35, 68, 79. More specifically, no reasonable juror could find that Defendants initiated a strategy to remove all support from HISL at, or before, the time that Mr. Bush and Mr. Horgan made their statements. Furthermore, even though Defendants do not carry the burden of negating Plaintiff's case, see Cray, 33 F.3d at 394, Defendants produced undisputed facts demonstrating support for the HISL brand extension. For example, after a major print advertising campaign for HISL in business publications in 1998, Defendants executed a partnership promotion in 2000 with Etrade, and in 2003, launched

---

[11] Furthermore, a review of the pleadings and exhibits reveals that Plaintiff and Defendants' marketing employees tend to use the terms, "brand" and "brand extension," interchangeably. See e.g., Def.'s Br. at 4, ¶ 19.

a print campaign in the Wall Street Journal, which highlighted the HISL message and HISL locations. Thus, the only proper evidence before the Court shows marketing support for the HISL brand extension before, and after, Plaintiff converted its hotel to a HISL. Furthermore, these HISL ad campaigns went above and beyond the contractual requirements, as the License Agreement states that Defendants are *not* required to expend marketing funds on the HISL brand extension.[12] (Pl.'s Ex. 51 at §§ 1(B), 4(D),(H).) In addition to marketing, Defendants supported HISL with conference presentations dedicated to HISL franchisees (Merkin Decl. at ¶ 23, Ex. O, P)(Def.'s Ex. 11)(Pl.'s Ex. 22), the HOLIDEX reservations system (Def.'s Br. at 6, ¶ 33), and personnel dedicated to HISL, including the hire of a new Director of Brand Management for HISL as recent as 2005 (Pl.'s Ex. 33). In light of this documented support and the absence of supported facts to the contrary, no reasonable juror could find by clear and convincing evidence that either Mr. Bush's or Mr. Horgan's statements of committed support were false representations. Accordingly, these statements cannot form the basis for fraud.

### 3. Whether HISL was a higher quality hotel that could charge higher room rates

Mr. Bush's and Mr. Horgan's alleged statements that HISL was higher quality, a cut above, geared towards business travelers, and able to command higher room rates do not create a triable issue of fraud. Stating that the HISL brand extension is of higher quality (or "a cut above") is not a false representation of material fact. First, the only relevant evidence before the Court is ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ (Def.'s Ex. 1 at 24-31, and Ex. 3 at 142) and the fact that HISL hotels are "full service," which connotes greater amenities (Merkin Decl. at ¶ 20). Second, under Virginia law,

---

[12] Instead, the License Agreement requires Defendants to use marketing funds to promote and service "the System," which is the family of Holiday Inn brands, including Holiday Inn Garden Court, Crown Plaza, Holiday Inn Express, and others. (Pl.'s Ex. 51 at §§ 1(B), 4(D),(H).)

stating that HISL is a higher quality hotel is an "expression of opinion that, as a matter of law, cannot form the basis for fraud." Scheduled Airlines Traffic Offices, Inc. v. Objective Inc., 180 F.3d 583, 589 (4th Cir. 1999)(applying Virginia law). In Scheduled Airlines, while negotiating a contract, a service company promised a software developer "very good visibility" and "lots of exposure" if the software was produced. The Fourth Circuit granted summary judgment against the fraud claim, holding that these promises were statements of opinion, not fact. Id. See also, e.g., Watson v. Avon St. Bus. Ctr., Inc., 311 S.E.2d 795, 798 (Va. 1984)(statement by seller's agent that warehouse had a "good roof" was "typical seller's talk, expressions of opinion insufficient to frame a jury issue in an action for deceit"). Thus, Mr. Bush's and Mr. Horgan's statements regarding HISL's higher quality cannot form the basis for fraud.

With respect to the stated demographic of business travelers, there is no evidence to suggest that Mr. Bush's and Mr. Horgan's statements were false at the time they were made. To the contrary, the major print advertising in business publications (in 1998, before Lake Wright's conversion), the partnership promotion with Etrade (in 2000, concurrent with Lake Wright's conversion), and the print campaign in the Wall Street Journal (in 2003) clearly focused on business travelers. In opposition, Plaintiff argues that Defendants withdrew all support from HISL, including its mission to build the brand extension around business travelers. As described above, however, Plaintiff improperly conjures this argument through unsupported facts, misleading statements, and misrepresentations. Thus, there is no evidence to indicate that HISL was not suited for, or not committed to targeting, business travelers. Accordingly, Mr. Bush's and Mr. Horgan's statements regarding the demographic of business travelers cannot form the basis for fraud.

Finally, Plaintiff does not present any evidence to show that HISL room rates fail to exceed

15

the room rates for normal Holiday Inn hotels. In fact, Dilip Desai, senior manager of Lake Wright, admitted that Lake Wright's HISL had a higher average daily room rate (ADR) than a regular Holiday Inn. (Def.'s Ex. 4 at 54-56.) Therefore, Mr. Bush's and Mr. Horgan's statements regarding the higher room rate are not false representations and cannot form the basis for fraud.

### 4. Whether the costs to convert to a HISL were reasonable

Mr. Horgan's alleged statement that the costs to upgrade to HISL were reasonable does not create a triable issue of fraud. Plaintiff's brief does not address this statement in particular, and the Court is not required to "ferret out the facts that counsel had not bothered to excavate." Cray Comm., Inc. v. Novatel Computer Sys., Inc., 33 F.3d 390, 396 (4th Cir. 1994). Also, stating that costs are "reasonable" most closely resembles an "expression of opinion," and thus, would not be actionable in fraud. Scheduled Airlines, 180 F.3d at 589; see also Watson, 311 S.E.2d at 798. Regardless, the ████████████████████████████████ suggests that the start-up costs were in fact reasonable. Mr. Horgan's statement was not a false representation of material fact, and thus, cannot form the basis for fraud.

### 5. Ongoing concealment theory

In light of the Plaintiff's fraud theory based on affirmative statements (discussed above), Plaintiff's concealment theory is largely redundant. After claiming Mr. Bush and Mr. Horgan made *affirmative misrepresentations* when they stated *support existed* for HISL, Plaintiff's concealment theory alleges fraud in Defendants' *failure to disclose* a *lack of support* for HISL. Thus, the only portion of the concealment theory that the Court has not yet addressed is the period of time *after* Mr. Bush and Mr. Horgan made their statements.

Plaintiff argues that between 2000 and 2006, "Defendants continually discussed the HISL

16

brand at regional and annual conferences and sent memos and slides specifically *intended* to demonstrate 'commitment,'" and that this triggered a duty to disclose the alleged lack of support for HISL. (Pl.'s Br. at 30.) This argument lacks merit. Again, Plaintiff improperly fabricated the pre-2000 plot to "kill" the HISL brand extension. See Appendix A, at ¶¶ 10-12, 16, 19-22, 35, 68, 79. Thus, there is no evidence in the record to suggest that the conferences and memos were hiding anything. Rather, the conferences and memos identified marketing efforts, described market challenges, and provided data representing the size and growth of HISL. If anything, these memos and presentations put Plaintiff on notice that HISL was not achieving a successful growth rate.[13] Furthermore, Plaintiff signed a License Agreement, which states that "Licensor may ... modify, alter or delete elements of the System in its sole discretion from time to time." (Pl.'s Ex. 51 at § 1(B).) HISL is one of these "elements." Id. Thus, disclosing HISL's disappointing growth year after year, then ultimately making a business decision in 2006 to cease "specific marketing initiatives" for HISL, neither breaches the Agreement nor forms the basis for fraudulent concealment.

Next, Plaintiff argues that the failure to disclose the abandonment of support for HISL in Defendants' Uniform Franchise Offering Circular ("UFOC"), on its own, creates a triable issue of material fact. This argument fails. First, Plaintiff's binding response to Defendants' Interrogatory Number 1 does not identify the UFOC as a source of fraud, nor is the UFOC even mentioned. (Def.'s Ex. 6, at 1-4.) Thus, under court order, the UFOC cannot form the basis for fraud in this litigation.

---

[13] The statute of limitations for fraud did not begin running until Defendants issued their Memorandum of March 24, 2006, however. This memorandum was the first indication that Defendants had ceased marketing initiatives specifically directed at HISL. Plaintiff filed the lawsuit in November 2007, which was timely under the statute of limitations for fraud of 2 years. See Va. Code § 8.01-243(A).

Even if the Court were to ignore its own order, however, the UFOC does not create a triable issue of fraud. Plaintiff states that its management reviewed the 2000 UFOC. (Pl.'s Br. at 19-20, ¶¶ 69, 72)(UFOC attached as Pl.'s Ex. 47). The first page of the UFOC states, in bold capital letters, that there may be other risks concerning the franchise. (Pl.'s Ex. 47, at D-0008314.) Also, Item 1 of the UFOC classifies HISL as a brand within the "Holiday Inn brand group" (Id. at D-0008318-19) and again discloses that "Holiday may . . . modify or delete elements of the System in its sole discretion" (Id. at D-0008318). Thus, the UFOC neither frames HISL as a standalone brand outside the umbrella of Holiday Inn, nor suggests that support will run in perpetuity for the HISL brand extension. Although Plaintiff argues that support had already been withdrawn from HISL, the allegation rests on Plaintiff's unsupported facts, misleading statements, and misrepresentations. See Appendix A, at ¶¶ 10-12, 16, 19-22, 35, 68, 79. As a result, Defendants could not have had a duty to disclose a lack of support for HISL if such support in fact existed.

Plaintiff's fervent reliance on Motor City Bagels, LLC v. Am. Bagel Co., 50 F. Supp. 2d 460 (D. Md. 1999) is misplaced. In Motor City, the district court found a factual question for fraud where: (1) franchisor gave prospective franchisee a 1993 UFOC, which estimated investment costs as $240,000 to $304,500; (2) franchisor revised the UFOC in 2004, raising the estimate to $288,300 to $376,000; (3) franchisor again revised the UFOC in 2005, raising the estimate to $328,800 to $431,000; and (4) court assumed that franchisor withheld the 2004 UFOC and 2005 UFOC from the prospective franchisee prior to the final signing of the agreement. Id. at 466-67, 473. Unlike the failure to disclose a vast disparity in investment costs already ascertained by the franchisor in Motor City, Defendants' estimate of HISL's investment costs (as $56,134 to $75,082 per guest room)(Pl.'s Ex. 47 at D-0008344) is not disputed by Plaintiff. These undisputed investment costs, combined

18

with the undisputed support for HISL, renders <u>Motor City</u> inapposite to the present case. In sum, neither Plaintiff's claim of fraudulent concealment, nor any other of Plaintiff's fraud theories, creates any genuine issue of material fact to support a finding of fraud by clear and convincing evidence. As a result, the Court recommends that summary judgment be granted in favor of Defendants on Count I of Plaintiff's Amended Complaint.

## C. Breach of Contract (Count IV)

Plaintiff's response to Defendants' Interrogatory Number 5 alleges that Defendants breached the following sections of the License Agreement: 4A (Training); 4B (Reservation Services); 4C (Consultation); 4D (Use of Marketing Contribution); 4E (Maintenance of Standards); 4H (Use of Other Promotional Funds); and 7C (Protection of Name and Marks). (Def.'s Ex. 6 at 5.) The Court will address each section in turn.

### 1. Section 4(A): Training

Section 4(A) of the License Agreement states, "During the License Term, Licensor will continue to specify and provide required and optional training services and programs at various locations." (Pl.'s Ex. 51 at 6.) Plaintiff argues that this sentence obligates Defendants to provide "Select-specific training," but the citation to the record yields another unsupported and misleading statement of fact. <u>See</u> Appendix A, at ¶ 82. The Court finds that the language of the Agreement, on its face, does not require HISL-specific training, only that Defendants provide training to the franchisees that enter into the License Agreement. Plaintiff does not present any evidence to show that Defendants failed to provide any training to Lake Wright's hotel. Rather, the only evidence before the Court indicates exactly the opposite. (<u>See</u> Def.'s Br. at 19, ¶ 111.) As a result, no reasonable juror could find that Defendants breached Section 4(A) of the License Agreement.

### 2. Section 4(B): Reservation Services

Section 4(B) of the License Agreement provides:

> During the License Term, so long as Licensee is in full compliance with its material
> obligations hereunder, Licensor will afford Licensee access to Reservation Service
> for the Hotel on terms consistent with this License.

(Pl.'s Ex. 51 at 6.)  It is undisputed that Plaintiff has had continuous access to the HOLIDEX

reservations system.  (Def.'s Br. at 19, ¶ 114.)  No reasonable juror, therefore, could find that

Defendants breached Section 4(B) of the License Agreement.

### 3. Section 4(C): Consultation on Operations, Facilities, and Marketing

Section 4(C) of the License Agreement provides:

> During the License Term, Licensor will, from time to time at Licensor's discretion,
> make available to Licensee consultation and advice in connection with operations,
> facilities and marketing.

(Pl.'s Ex. 51 at 6.)  First, the language of the Agreement empowers Defendants with full discretion

to decide the timing of the consultations.  Second, Plaintiff conceded that the breach of this provision

first took place in either 2007 or 2008 (Pl.'s Ex. 50 at 93), but filed the Amended Complaint on

December 20, 2007.  This represents a small window of time to mandate providing consultations,

especially when the provider has full discretion with respect to timing.  More importantly, however,

it is undisputed that "Defendants specifically offered Plaintiff consultation regarding rate

opportunities after approving the new Holiday Inn Express." (Def.'s Br. at 20, ¶ 116.)  Thus, no

reasonable juror could find that Defendants breached Section 4(C) of the License Agreement.

### 4. Section 4(D): Use of Marketing and Reservation Contribution

Unlike Plaintiff's misrepresented version of Section 4(D) in the Opposition Brief,[14] the

---

[14] See Appendix A, at ¶ 80.

20

License Agreement actually reads:

> The Marketing Contribution will be used by Licensor for costs associated with advertising, promotion, publicity, market research, and other marketing programs and related activities *for the System*.

(Pl.'s Ex. 51 at 7)(emphasis added).  The first page of the Agreement defines "the System" as "Holiday Inn hotels," which includes all the service marks (Holiday Inn Garden Court, Crown Plaza, Holiday Inn Express, HISL, and others).  Thus, Defendants are under a duty to spend the marketing funds contributed by HISL franchisees to marketing "for the System."  This does not include a duty to spend these funds to market the individual HISL brand extension.  Therefore, no reasonable juror could find that Defendants breached Section 4(D) of the License Agreement by spending funds from HISL franchisees' marketing contributions on promoting the overall System.

### 5. Section 4(E): Maintenance of Standards

Section 4(E) of the License Agreement provides:

> Licensor will conscientiously seek to maintain high standards of quality, cleanliness, appearance and service at all hotels using the System so as to promote, protect and enhance the public image and reputation of the Holiday Inn name and to increase the demand for services offered by the System.  Licensor's judgment in such matters shall be controlling in all respects, and it shall have wide latitude in making such judgments.

(Pl.'s Ex. 51 at 7).  Again, the Agreement grants full discretion to Defendants.  More importantly, Plaintiff has not presented any evidence to show that Defendants undermined the "quality, cleanliness, appearance and service" of Lake Wright's hotel.  Thus, no reasonable juror could find that Defendants breached Section 4(E) of the License Agreement.

### 6. Section 4(H): Licensor's Use of Other Advertising/Promotional Support Funds

Section 4(H) of the License Agreement provides:

> To the extent that advertising and/or promotional support and/or funding may

become available to Licensor's parent, affiliates or subsidiaries and/or Licensor from third parties on account of the totality of the activities of Licensor's parent, affiliates and subsidiaries, including hotels operated under the System, such support and/or funding may be used or designated by Licensor's parent, affiliates or subsidiaries, or Licensor, to benefit such enterprises in the aggregate, in such proportion and manner as Licensor's parent, affiliates or subsidiaries, or Licensor determines reasonably promotes the totality of such enterprises, exercising reasonable good faith business judgment with respect to such determination, provided that any such support or funding coming from activities of the System *shall be used for benefit of the System.*

(Pl.'s Ex. 51 at 8)(emphasis added).  Similar to Section 4(D), Section 4(H) requires only that the

funds be used for "benefit of the System."  Id.  Plaintiff argues that Defendants breached Section

4(H) by "fail[ing] to provide Select-specific 'support.'" (Pl.'s Br. at 23, ¶ 83.)  Section 4(H) does not

mandate HISL-specific support, and thus, no reasonable juror could find that Defendants breached

Section 4(H) of the License Agreement.

### 7. Section 7(C): Protection of Name and Marks

Section 7(C) of the License Agreement provides, in part:

Both parties will make every effort consistent with the foregoing to protect and maintain the name and mark "Holiday Inn" and its distinguishing characteristics (and the other service marks, trademarks, slogans, etc., associated with the System).

(Pl.'s Ex. 51 at 10).  Plaintiff argues that Defendants violated Section 7(C) by both (a) "publicly

denigrat[ing] the Select Mark" in an interview with Brandweek magazine, and (b) removing support

from the brand. (Pl.'s Br. at 22, ¶ 81.)  Section 7(C) does not override other provisions in the

License Agreement, however, such as Defendants' right under Section 1(B) to delete service marks

from the System.  Implied in the right to delete HISL from the System is Defendants' right to

publicize this business decision.  Defendants' executive, Peter Gowers, explained to Brandweek

magazine, in February 2007, that Defendants had conducted the hotel industry's "largest marketing

research study" and learned that "Holiday Inn as a brand captures the vast majority of customers in

22

the hotel market already . . . ." (Pl.'s Ex. 41.) As a result, "there was no need for the Holiday Inn Select sub-brand distinction . . . ." Id. Section 7(C) does not prohibit a business decision, based on extensive research, to discontinue a service mark in the System, nor does it prohibit publicity of the business decision. Accordingly, no reasonable juror could find that Defendants breached Section 7(C) of the License Agreement.

In sum, the evidence before the Court does not create a genuine issue of material fact regarding the alleged breach of any section of the License Agreement. Accordingly, the Court recommends that summary judgment be granted in favor of Defendants on Count IV of the Amended Complaint.

## D. Breach of the Implied Covenant of Good Faith and Fair Dealing (Count II)

Plaintiff argues that the Defendants breached the implied covenant of good faith and fair dealing by (a) concealing the "strategy shift" to kill HISL, (b) publicly denigrating HISL, (c) violating the impact policy, and (d) approving a Holiday Inn Express less than a mile from Lake Wright's hotel. First, as described in the Court's discussion of the fraud count (Count I), Plaintiff used unsupported facts, misleading statements, and misrepresentations to portray a plot to kill HISL, which did not exist. See Appendix A, at ¶¶ 10-12, 16, 19-22, 35, 68, 79. With respect to the publicity, impact policy, and Holiday Inn Express, however, the issue turns on whether the implied covenant can be violated by conduct authorized under the contract.

The case law of Georgia[15] clearly holds that "[t]here can be no breach of an implied covenant

---

[15] In his Order dated March 11, 2008 [Doc. 28], District Judge Doumar held that "Georgia law governs the Plaintiff's contract claims . . . ." (March 11, 2008 Order, at 19.) Judge Doumar did not reach the issue of whether Georgia law recognizes an independent claim for breach of the implied covenant, however, because Plaintiff had alleged sufficient facts to assert a breach of the underlying contract (to survive a Rule 12(b)(6) dismissal). Id. at 16.

of good faith where a party to a contract has done what the provisions of the contract expressly give him the right to do." <u>Automatic Sprinkler Corp. of Am. v. Anderson</u>, 257 S.E.2d 283, 284 (Ga. 1979). <u>See also</u> <u>Marathon U.S. Realties, Inc. v. Kalb</u>, 260 S.E.2d 85, 87 (Ga. 1979); <u>Tommy McBride Realty, Inc. v. Nicholson</u>, 648 S.E.2d 468, 470 (Ga. App. 2007)(holding "it is also well settled that a party does not breach its obligation of good faith where it exercises a right that it has under the contract"); <u>Greenwald v. Columbus Bank & Trust Co.</u>, 492 S.E.2d 248, 251 (Ga. App. 1997)(holding "a contracting party cannot breach an implied covenant of good faith where it has done what the provisions of the contract expressly permit it to do"). Under the contract at issue in <u>Automatic Sprinkler</u>, for example, awarding incentive compensation was "within the discretion of the corporation. . . ." 257 S.E.2d at 284. The corporation summarily rejected the plaintiff's request for incentive compensation, and the Georgia Supreme Court found summary judgment appropriate, in favor of the corporation, because the contract left the "decision[] absolutely to the uncontrolled interest of one of the parties [the corporation] and in such a case the issue of good faith is irrelevant." <u>Id</u>. Thus, under Georgia law, if Defendants acted pursuant to express authorization in the License Agreement, Defendants did not breach the implied covenant of good faith and fair dealing.

The License Agreement grants broad discretion to Defendants in two relevant areas. Under Section 1(B), as discussed earlier, Defendants may "delete elements of the System in its sole discretion . . . ." (Pl.'s Ex. 51 at 2.) Thus, Defendants have authority to delete the HISL brand extension, and Mr. Gower's statements to Brandweek magazine publicizing an authorized business decision (Pl.'s Ex. 41) breaches neither the License Agreement nor the implied covenant of good faith and fair dealing. Second, Section 2 of the License Agreement grants Plaintiff a "non-exclusive license" and permits Defendants to license another hotel "at any other location." (Pl.'s Ex. 51 at 2.)

Accordingly, Defendants have a right to license a Holiday Inn Express "at any other location," including within one mile of Lake Wright's hotel. Under the holding in <u>Automatic Sprinkler</u>, "[t]here can be no breach of an implied covenant of good faith where [Defendants have] done what the provisions of the contract expressly give [them] the right to do." 257 S.E.2d at 284.

Finally, Plaintiff's argument that Defendants violated the impact policy lacks merit. Plaintiff represents to the Court that "[u]nder Defendants' policy, if impact is too high, the project cannot be approved." (Pl.'s Br. at 24, ¶ 88.) Neither cited deposition supports this statement. It is yet another example of an unsupported fact. For example, when pressed, deponent Adams makes it clear that the impact study is merely a "factor," and not dispositive. (Pl.'s Ex. 56 at 66-69.) Thus, putting aside Plaintiff's unsupported litmus test, Section 2 of the License Agreement authorizes Defendants to approve the license for the Holiday Inn Express (at any location). Furthermore, although under no obligation to do so, Defendants offered to do the following: (a) give Plaintiff a credit on its franchise fees during the first two years of the new Holiday Inn Express's operation; (b) conduct an impact tracking study once the new hotel opens; and (c) consult with Plaintiff regarding potential rate opportunities. (Def.'s Br. at 8-9, ¶¶ 48, 50, 51.) Plaintiff declined these offers (<u>Id.</u> at 9, ¶ 53.) As a result, no reasonable juror could find that Defendants' approval of the Holiday Inn Express license after conducting the impact study violated the implied covenant of good faith and fair dealing.

The evidence before the Court does not create a genuine issue of material fact regarding the alleged breach of the implied covenant of good faith and fair dealing. Accordingly, the Court recommends that summary judgment be granted in favor of Defendants on Count II of the Amended Complaint.

**E. Violation of the Virginia Retail Franchising Act (Count III)**

The Virginia Retail Franchising Act ("VRFA") provides that "[i]t shall be unlawful for a franchisor to cancel a franchise without reasonable cause or to use undue influence to induce a franchisee to surrender any right given to him by any provision contained in the franchise." Va. Code § 13.1-564. Since its franchise license has not been cancelled, Plaintiff argues a violation under the second prong, claiming that Defendants used "undue influence" to coerce Lake Wright to surrender its rights under the License Agreement. Specifically, Plaintiff alleges that Defendants forced Lake Wright "into a ridiculous and unwarranted Hobson's choice" to either: (a) "exit the system and pay a hefty termination fee; (b) expend substantial sums to 'convert' to another of Defendents' hotel brands; or (c) remain a HISL, a brand Defendants dissolved and now denigrate . . . ." (Pl.'s Br. at 38.)

Plaintiff's alleged "Hobson's choice," however, distorts the evidence and fails to identify a single surrendered right. Defendants' Memorandum of March 24, 2006 invited the HISL owners to remain a HISL for the remainder of their respective license agreements.[16] Defendants continue to maintain the HISL website, and Plaintiff continues to enjoy call center support and access to the HOLIDEX reservations system. With respect to marketing, the License Agreement only requires that Defendants spend the marketing contribution on promoting the overall System, which Defendant does. Moreover, for those franchisees that wished to convert to another brand, Defendants offered to pay for the change in signage (Pl.'s Ex. 35) and waive the $5,000 brand change fee (Pl.'s Ex. 52), even though Defendants were under no obligation to do so. Finally, Plaintiff has not cited, and this

---

[16] The VRFA imposes no duty beyond the expiration of the License Agreement as "the Act does not require renewal or extension of a franchise after it lawfully terminates according to its terms." Betsy-Len Motor Hotel Corp. v. Holiday Inns, Inc., 385 S.E.2d 559, 560-61 (Va. 1989).

Court cannot find, any controlling precedent to suggest that Plaintiff has surrendered a right within the meaning of the VRFA. To the contrary, Defendants' undisputed decision to honor the duration of each HISL license agreement and Defendants' undisputed efforts to facilitate less costly transitions for HISL franchisees comports with the VRFA's requirement that "franchisors . . . deal fairly with their franchisees." Va. Code § 13.1-558. No reasonable juror could find, therefore, that Defendants violated the VRFA. Accordingly, the Court recommends that summary judgment be granted in favor of Defendants on Count III.

## V. RECOMMENDATION

### A. Recommendation on Motion for Summary Judgment

For the foregoing reasons, the Court recommends that summary judgment be GRANTED in favor of Defendants on all counts, and that the case be dismissed.

### B. Recommendation on Sanctions

The Plaintiff should pay Defendants' "expenses including reasonable attorney's fees and court costs," as the parties contracted. See License Agreement § 14(I).

The undersigned has been on the bench for more than twenty-one years. Many attorneys have litigated before the Court during this tenure, but Plaintiff's counsel has surpassed all others in presenting arguments instead of facts, unsupported and misleading statements improperly alleged as facts, and finally, misrepresentations.

The undersigned recommends that the District Judge consider sanctions against Plaintiff's counsel. One sanction could be referral to the Virginia State Bar for an ethical investigation as to whether the two lawyers for the Plaintiff in this case knowingly made false statements to the court in violation of Rule 3.3(a)(1) of the Virginia Rules of Professional Conduct. Without an evidentiary

27

hearing addressing reasons for counsel's actions in this case, it is difficult to ascertain whether counsel's presentation of the "Statement of Facts" in Plaintiff's brief resulted from bad faith, sharp practice, negligence, inadvertence, or incompetence. See, e.g., Monroe v. Angelone, 323 F.3d 286, 316 n.61 (4th Cir. 2003). For purposes of this Report and Recommendation, however, counsel's conduct is sufficiently improper to merit sanction, regardless of the cause.

The District Judge may also consider other sanctions, such as requiring Plaintiff's counsel to attend ethics or professional training courses.

If the District Judge directs payment of all expenses, including reasonable attorneys' fees and court costs, as recommended above, the Defendant will be made whole for its out of pocket costs, but not for the expenditure of the time for the Defendant's employees to defend the suit. Accordingly, the reviewing District Judge may consider imposing monetary sanctions against Plaintiff's counsel to compensate for the time wasted of the Defendant, as well as the Court.

## REVIEW PROCEDURE

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1. Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within ten (10) days from the date of mailing of this report to the objecting party, see 28 U.S.C. § 636(b)(1)(C), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure, plus three (3) days permitted by Rule 6(e) of said rules. A party may respond to another party's objections within ten (10) days after being served with a copy thereof.

2. A district judge shall make a de novo determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this court based on such findings and recommendations. Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466, 88 L.Ed.2d 435 (1985); Carr v. Hutto, 737 F.2d 433 (4th Cir. 1984), cert. denied, 474 U.S. 1019 (1985); United States v. Schronce, 727 F.2d 91 (4th Cir.), cert. denied, 467 U.S. 1208 (1984).

_____/s/_____
Tommy E. Miller
United States Magistrate Judge

Norfolk, Virginia
March 2, 2009

29

## CLERK'S MAILING CERTIFICATE

A copy of the sealed, unredacted  foregoing Report and Recommendation was mailed this

date to each of the following:


Randall K. Miller, Esq.
Nicholas M. DePalma, Esq.
Arnold & Porter, LLP
555 12th Street N.W.
Washington, DC 20004

Robert M. Tata, Esq.
Wendy C. McGraw, Esq.
Hunton & Williams, LLP
500 East Main Street
Norfolk, VA 23510




Fernando Galindo, Clerk

By _____

Deputy Clerk
March 2 , 2009

30

**Appendix A**

In the Opposition to Motion for Summary Judgment [Doc. 103], Plaintiff crafted a counter-statement of facts with (a) argument, (b) unsupported facts, (c) misleading statements, and (d) misrepresentations of fact. The listings in this Appendix are highlighted examples, not exhaustive, of Plaintiff's improper briefing, and the paragraphs are numbered to correspond with the numbering of Plaintiff's brief. All references to exhibits identify those exhibits attached to Plaintiff's brief, unless otherwise indicated. Further, the following discussion applies equally to Plaintiff's (so-called) corrected version of the brief.[17]

7.　The first sentence of Paragraph 7 states, "by 1998 [marketing contributions] provided more than $5 million for HISL advertising," which is <u>unsupported</u> by the cited deposition. The second sentence states that "Defendants were *required* to spend more than [the $5 million] to 'kick start' the new brand and budgeted $7.6M for the brand in 1998." Although the deposition identifies the $7.6 million budget number, neither the deposition nor the presentation suggests any "requirement" to spend *any amount* of money. Thus, the "requirement" is <u>unsupported</u>.

9.　Paragraph 9 states that Defendants "planned to increase the HISL marketing to $12-15M over the next four years," but at best, this is <u>misleading</u>. Exhibit 15 is the only relevant source cited, but it does not indicate a plan to increase marketing expenditures. Rather, it merely forecasts the expected marketing *assessments* (contributions) from the Select franchisees by multiplying *forecasted revenue* (of franchisees) by the assessment percentage. A forecast of contributions, based on revenue, is clearly distinct from a marketing budget.

10.　The second sentence of Paragraph 10 is both <u>unsupported</u> and <u>misleading</u>. Plaintiff states that "Defendants eliminated plans to establish HISL as a separate and differentiated brand, and instead decided to relegate it as a mere marketing device to elevate the core Holiday Inn

---

[17] At a hearing on January 15, 2009, the District Judge ordered that Plaintiff be allowed to file corrections to the Opposition brief. On January 19, 2009, Plaintiff filed the corrections [Doc. 151]. Out of the 31 corrections, only 1 (¶ 47) is relevant to the Court's serious concerns with the brief.

brand." First, in the cited email (Ex. 16), John Chandler explains to Ms. Schulwolf that there is only one brand--the overarching Holiday Inn brand. He states that "HISL will not be broken off of Holiday Inn as a brand." More importantly, the email does not suggest that plans ever existed to establish HISL as a separate brand. (Note: Plaintiff's attempts in ¶¶ 3, 5, 6, 8 to establish the existence of an earlier plan are based on unsupported facts and misleading argument.) Thus, a business cannot "eliminate plans" that never existed.

Second, to construe the "strategy shift" as a "relegation" of HISL to a "mere marketing device" is misleading argument. In the cited deposition, Schulwolf explains how the strategy endowed HISL with "more exposure" because she could evaluate the marketing using "Holiday Inn dollars" to put HISL on a "bigger playing field." The cited sources do not mention any "relegation."

In conclusion, Paragraph 10 relies on unsupported facts and misleading argument. As a result, it fails to dispute Defendants' facts (Def.'s Br. ¶¶ 19-20, 23-24), as claimed.

11.   Plaintiff fails to even cite a source. This paragraph is unsupported and argument. As a result, it fails to dispute Defendants' facts (Def.'s Br. ¶ 24), as claimed.

12.   (i)    Unsupported (see discussion of ¶¶ 25, 26)

(iii)   Use of "halted" is misleading. There is no evidence in the cited sources that Defendant "halted" sales of HISL franchises.

(v)    Use of "ostensible basis" is misleading because it improperly suggests that Ms. Schulwolf indicated a duplicitous motive, which is not in the deposition.

(vii)   Plaintiff cites an email brainstorm by a subordinate, which is not accepted by the boss's reply. Thus, the "fact" is misleading.

(viii)  Plaintiff states that HISL was "dead," which is both unsupported and misleading.

16.   The second sentence improperly alleges as fact that John Chandler proposed "secretly diverting" money from HISL to Holiday Inn. It is unsupported.

19.   The first sentence, "Later in 1998, Ms. Schulwolf recognized that the HISL brand was dead," is argument, unsupported, and misleading. Schulwolf's email (Ex. 17) merely states that the HISL marketing strategy has been executed poorly.

20.   The first sentence is completely unsupported by Exhibit 17. It is so misleading that it constitutes a misrepresentation.

21.    The first sentence is <u>argument</u> and <u>unsupported</u>.  Plaintiff alleges as fact that "Mr. Chandler began implementing Defendants' decision to *kill* HISL" without citing a source.  In Exhibit 17, cited at the end of the paragraph, Chandler briefly explains Schulwolf's role as "head of business traveler marketing," but there is no discussion of downsizing HISL, and certainly no implication of "killing" it.

22.    The second sentence is <u>misleading</u>.  Plaintiff alleges that the dismantling of the brand and services teams was the "continued implementation of the 1998 plans."  The presentation (Ex. 7, at 19097) clearly states that the 1998 plan was "The year of differentiation and positioning."  Also, the heading of the page refers to "strategic and tactical plans that sought to address *the issue*."  By turning the presentation back one page, it is clear that "the issue" was a need for "differentiation and awareness."  Thus, tying the dismantling to a nefarious 1998 plan to kill HISL (see ¶ 21) is not supported by the exhibit.  Accordingly, Defendants' facts (Def.'s Br. ¶¶ 23-25) are not disputed, as claimed.

26.    Plaintiff plays fast and loose with the budget numbers.  First, Plaintiff states that $600,000 was "carried over" from 2000 to 2001.  Second, Plaintiff alleges as fact that the *budget for 2001 was $300,000*, so the "carried over" money "was dispersed elsewhere."  The source page for the $600,000 carry-over, however, identifies a *budget for 2001 of $1.5 million*.  Because $300,000 does not equal $1.5 million, Plaintiff is not comparing apples to apples.  Thus, the paragraph is <u>misleading</u>.

27.    The last sentence of the paragraph is <u>unsupported</u> and <u>misleading</u> for the same reasons discussed in Paragraph 9.

33.    The first sentence is <u>argument</u> and <u>unsupported</u> by Exhibit 16.

35.    This paragraph, on its own, merits consideration for sanction.  (1) These statements are not facts.  (2) Plaintiff does not cite a single source.  (3) Even as argument, they are unsupported and misleading.  In sum, the paragraph constitutes a <u>misrepresentation</u> of material fact, and its tone is inflammatory.  As a result, it fails to dispute Defendants' facts (Def.'s Br. ¶ 22), as claimed.

37.    Plaintiff does not cite a single source.  The paragraph is <u>argument</u> and <u>unsupported</u>.

39.    The first sentence of the paragraph states that Ms. Schulwolf's assurances to franchisees was "part of Defendants' ongoing plans to deceive and use HISL franshisees."  This is <u>unsupported</u>, not by Exhibit 27, or any other exhibit attached to Plaintiff's brief.

42.   Plaintiff improperly inserts "pretense" and "ruse" into the paragraph, which is <u>argument</u> and <u>unsupported</u>. These words alter what would have been a fair statement of fact, and therefore, the paragraph fails to dispute Defendants' facts (Def.'s Br. ¶¶ 23-25), as claimed.

46.   The first sentence is a <u>misrepresentation</u> of fact. The cited presentation does not recommend that HISL should die. Rather, page 19084 of Exhibit 7 merely outlines the pros and cons of ending HISL. Moreover, the *Recommendations* section of the same presentation actually recommends pursuing HISL growth, complete with a recommended strategy for doing so. (Ex. 7, at 19091-95).

47.   In its original brief, Plaintiff included a <u>false quotation</u>. The quote "discontinued in 2001" did not appear in the cited deposition. In the "corrected version" of the brief, Plaintiff substituted in a new quote, "fold[ed] back into Holiday Inn," but cited pages of Exhibit 4 that were not attached to either brief. The fact is not material, but exemplary of Plaintiff's inability to adhere to the rules of the Court.

53.   Plaintiff uses more <u>false quotations</u>. The quoted word, "retired," does not appear on page 77 of Exhibit 8, as cited. In Exhibit 5, "extinct" is in the *attorney's question*, not the deponent's answer. More importantly, the deponent does not answer the question in the affirmative.

56.   Plaintiff's mischaracterization of Reinhold's testimony is <u>misleading</u>. There is no mention of "punishment" for remaining a HISL, and Reinhold explains how the company "encourages" conversion by offering to pay for signs and make things as easy as possible for the franchisees. Accordingly, the paragraph fails to dispute Defendants' facts (Def.'s Br. ¶¶ 31-34), as claimed.

57.   This paragraph is equally <u>misleading</u>, since it states an ultimatum of (a) "leave the system" or (b) "pay more money to convert to another IHG branded property." According to the cited document, however, the franchisees had a third option to remain a HISL. Thus, the paragraph fails to dispute Defendants' facts (Def.'s Br. ¶¶ 31-34), as claimed.

58.   Without even a single citation for support, Plaintiff states as fact, "This statement decreased the value of existing HISL hotels." This material fact is completely <u>unsupported</u>.

67.   This entire paragraph is <u>argument</u> and not strongly supported by the cited pages. The phrase, "which were deceptive and failed to reveal the truth," is completely <u>unsupported</u>. Thus, the paragraph fails to dispute Defendants' facts (Def.'s Br. ¶ 68), as claimed.

68.    Plaintiff improperly cobbles together quotations into a <u>misleading</u> "acknowledgment" of implementing a secret plan of wrongdoing. The paragraph fails to dispute Defendants' facts (Def.'s Br. ¶ 25), as claimed.

75,76.  Plaintiff inserts improper argument throughout the entire facts section, but Paragraphs 75 and 76 bombard the Court with <u>argument</u> of legal conclusions. Furthermore, Plaintiff argues <u>unsupported</u> material issues, and attempts to put Defendants' facts into dispute without citation to facts on the record. This blatant disregard for preserving the integrity of the statement of facts merits consideration of sanction, and fails to dispute Defendants' facts (Def.'s Br. ¶ ¶ 84-96), as claimed.

79.    Apart from the first clause of the first sentence, Paragraph 79 is another serious example of improper <u>argument</u> of both <u>unsupported</u> facts ("using the dead HISL brand as a tool to elevate the core brand and refusing to support HISL as a differentiated brand yet feigning 'commitment'") and legal conclusions ("Lake Wright *reasonably believed* Defendants' false expressions of 'commitment.'").

80.    Plaintiff selectively quotes the License Agreement to alter the most important term of Section 4(D). Plaintiff quotes the License Agreement, but quotes as follows:

>        The License requires Defendants to use "[t]he marketing contribution . . . for costs associated with advertising, promotion, publicity, market research, and other marketing programs and related activities" *for HISL.*

The actual text of the License Agreement (Ex. 51, at p.7), however, reads:

>        The Marketing Contribution will be used by Licensor for costs associated with advertising, promotion, publicity, market research, and other marketing programs and related activities *for the System.*

Page 1 of the Agreement clearly defines "the System" as "Holiday Inn hotels," which includes all the service marks (Holiday Inn Garden Court, Crown Plaza, HISL, etc.).

Plaintiff cut the quotation short and substituted "for HISL" in the place of "for the System." Due to the nature of the claim for breach of contract, this amounts to a <u>misrepresentation</u> of material fact and merits consideration of sanction.

82.    Plaintiff again quotes the License Agreement, but straps on three of its own words at the beginning, "Defendants did not," which alters the first sentence into a completely <u>unsupported</u> (and <u>misleading</u>) statement of material fact. Also, the paragraph states that "[t]he License required Select-specific training" by citing to three lines of a deposition where

35

the deponent merely states that certain HISL services are not offered at all the Holiday Inns (Ex. 50, at p.86). The paragraph fails to dispute Defendants' facts (Def.'s Br. ¶ ¶ 110-12), as claimed.

87. In the first sentence, "Defendants approved this hotel over Lake Wright's objections," is <u>unsupported</u>. In the second sentence, ". . . due to the impact on Lake Wright," is <u>unsupported</u>. The last sentence <u>argues</u> beyond the scope of facts contained in Exhibit 41.

88. Plaintiff states, "Under Defendants' policy, if impact is too high, the project cannot be approved." Neither deposition supports this. It is an <u>unsupported</u> fact. For example, when pressed, Mr. Adams makes it clear that the impact study is merely a "factor," and not dispositive. (Ex. 56, at 66-69.) Accordingly, the paragraph fails to dispute Defendants' facts (Def.'s Br. ¶ ¶ 39-42, 48), as claimed.

90. Paragraph 90 contains improper <u>argument</u> and <u>unsupported</u> facts (many of which lack even a citation). Overall, the paragraph is <u>misleading</u>

93. The second sentence is <u>unsupported</u> and actually contradicted by the cited Adams deposition (as described above, in Paragraph 88). The paragraph fails to dispute Defendants' facts (Def.'s Br. ¶ 41), as claimed.

94. Plaintiff improperly extrapolates a bounty of "fact" from three ambiguous lines of deposition testimony. Paragraph 94 is <u>unsupported</u> and fails to dispute Defendants' facts (Def.'s Br. ¶ ¶ 104-07), as claimed.

95. Plaintiff used selective quotations to create a <u>misleading</u> "fact." Clever use of ellipses omits the phrase, "in appropriate circumstances." The omission changes the meaning of the statement from (a) Defendant has discretion, to (b) the impact study has a dispositive effect. The paragraph fails to dispute Defendants' facts (Def.'s Br. ¶ ¶ 104-07), as claimed.

102. Plaintiff states as fact that PLC's CEO "decided to officially 'merg[e] Holiday Inn and Select' in January of 2006." This is <u>unsupported</u> by both cited sources. Exhibit 63, a sealed document, does nothing to support the orchestration of a "final scam" or an "official" decision to merge the two brands. Exhibit 64 (an email) merely states that the team "need[s] to evaluate whether we will have enough data to get a decision" from the executives on "merging Holiday Inn and Select or Express." Again, Plaintiff selectively quotes sources in order to <u>mislead</u> the Court.